IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LORI SMITH, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 21 C 2066 ) |
| LUTHERAN LIFE MINISTRIES and BOARD OF DIRECTORS OF LUTHERAN LIFE MINISTRIES, | ) Judge Joan H. Lefkow ) ) ) ) |
| Defendants. | ) |

**OPINION AND ORDER**

In this case brought under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq*., Plaintiff Lori Smith claims that Defendants Lutheran Life Ministries (LLM) and LLM's Board of Directors (the Board) owe her severance payments and other compensation based on the circumstances of her departure from LLM's employ. (Dkt. 34.)[1] After the court granted in part and denied in part LLM's previous motion to dismiss (*see* dkt. 15), Smith twice amended her complaint. LLM and the Board now move to dismiss the Second Amended Complaint's two ERISA counts (Counts I and II) under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 38.) Also before the court is Smith's motion to strike an allegedly new argument made by LLM in its motion to dismiss reply brief. (Dkt. 54.) For the reasons described below, LLM's motion is granted, and Smith's motion is denied.

---

[1] This court presently has jurisdiction over the action under 28 U.S.C. § 1331 and 28 U.S.C. § 1367, and venue is proper under 28 U.S.C. § 1391(b).

**BACKGROUND**

Smith alleges the following in her Second Amended Complaint. At all times relevant to this case, Smith resided in O'Fallon, Missouri. (Dkt 34, ¶ 9.) LLM is an Illinois not-for-profit corporation that does business in the Village of Arlington Heights, Illinois. (*Id.* ¶ 10.) In September 2018, LLM's CEO and President Jesse Jantzen, a former supervisor of Smith, began to recruit Smith to work with the company as part of its management team. (*Id.* ¶ 13.) During the negotiations, LLM promised Smith that she would not have to permanently relocate to Illinois but would be required to work on site in Illinois as needed. (*Id.* ¶ 14.) To persuade Smith to leave her prior employment, LLM promised she would receive 18-months' severance pay and a residence to live at when she was required to work in Illinois, along with other inducements. (*Id.* ¶ 15.) The offer letter made clear that Smith would receive such severance payments "in the event of a change of control as outlined in the agreement." (*Id.* Ex. B at 2.) Relying on these representations, Smith accepted LLM's offer of employment on December 28, 2018. (*Id.* ¶ 16.)

Also on December 28, 2018, Smith and LLM entered into an agreement entitled "Agreement Under Lutheran Life Ministries Change in Control Severance Plan" (the Severance Agreement), which was referenced in and attached to LLM's offer letter. (*Id.* ¶ 17; *id.* Ex. A.) The Severance Agreement specifies that it is a contract, effective December 28, 2018, between Smith and LLM "under the Lutheran Life Ministries Change in Control Severance Plan [(the Reference Plan)]." (*Id.* Ex. A at Recitals.) The Severance Agreement's recitals then relate:

> LLM considers the maintenance of a vital management group to be essential to protecting and enhancing the best interests of the LLM System[,] and to that end LLM has established the [Reference] Plan to provide benefits to certain management employees in the event their employment is terminated under the circumstances described herein. Participation in the [Reference] Plan is evidenced by an individual agreement between LLM and each participating employee.

2

(*Id.* ¶ 18; *id.* Ex. A at Recitals.) The Severance Agreement further provides that "LLM and [Smith] agree that [Smith] shall become a Participant in the [Reference] Plan subject to the following terms which form a part of the [Reference] Plan with respect to [Smith]'s participation therein" (*id.* ¶ 19; *id.* Ex. A at Recitals), and that "[Smith] acknowledges receipt of a copy of the [Reference] Plan" (*id.* ¶ 21; *id.* Ex. A at ¶ 2). At the time the parties executed the Severance Agreement, LLM only provided Smith with a copy of the Severance Agreement, and Smith correspondingly believed that all terms of the Reference Plan were fully contained within the Severance Agreement. (*Id.* ¶¶ 23–24.) No other plan terms beyond those written in the Severance Agreement were discussed with Smith or provided to her during her employment. (*Id.* ¶¶ 24–25.)

As for severance, the Severance Agreement provides that "[i]f [Smith]'s employment is terminated during a Transition Period (a) by the LLM System other than for Cause, death, or disability, or (b) through Constructive Termination, then LLM shall pay [Smith 78 weeks' worth of severance.]" (*Id.* Ex. A at ¶ 3(c).) The Severance Agreement provides no definition of "Transition Period" but indicates that "[d]efined terms used in this Agreement shall have the definitions assigned to those terms in the [Reference] Plan." (*Id.* Ex. A at ¶ 1.) The Severance Agreement defines "Constructive Termination" as any "material reduction" in Smith's responsibilities, title, or pay, as well any requirement that Smith work at an LLM location outside of Cook, Lake, DuPage, Will, Kane, or McHenry counties or relocate her primary residence to Illinois. (*Id.* Ex. A at ¶ 9.)

Smith began her employment with LLM as Chief Operations and Nursing Officer on February 4, 2019, commuting from her home in Missouri to Illinois as needed. (*Id.* ¶ 26.) On March 31, 2020, Jantzen left the company. (*Id.* ¶ 27.) In September 2020, LLM hired Sloan Bentley as its new President and CEO. (*Id.* ¶ 28.) At a September 15, 2020 meeting between

Smith and Bentley, Bentley directed Smith to move out of the executive housing LLM had provided her. (*Id.* ¶ 29.) Bentley and Smith then emailed back and forth as Bentley attempted to locate a copy of Smith's offer letter and the Severance Agreement. (*Id.* ¶¶ 30–32.) In an October 19, 2020 email, Bentley informed Smith that she had located the documents and attached a copy of both the offer letter and the Severance Agreement to her email. (*Id.* ¶¶ 32–34.) In December 2020, LLM removed Smith from many of her management responsibilities and assigned them to a newly created position. (*Id.* ¶¶ 35–37.) Bentley also directed Smith at this time to vacate the company-provided executive housing and to be present in LLM's offices Monday through Friday at least every other week. (*Id.* ¶ 38.)

Smith interpreted the loss of managerial responsibilities and access to executive housing as constructive termination under the Severance Agreement. (*Id.* ¶ 39.) As a result, Smith sent a letter to the Board on January 3, 2021, in which she gave notice that her last day as an LLM employee would be February 5, 2021. (*Id.* ¶ 40; *id.* Ex. D.) Smith also used this letter to provide notice to the Board of her claim to initiate severance payments under the Severance Agreement following the end of her employment. (*Id.* ¶¶ 40–41.) On January 4, 2021, Smith received a response from Bentley acknowledging that the Board had received Smith's letter and informing her that the Board had denied her claim for severance. (*Id.* ¶¶ 42–43.) Bentley's response provided no information regarding any further administrative remedy or appeal process. (*Id.* ¶ 42; *id.* Ex. E.) Smith made a second demand for severance on March 19, 2021, after she had left the company, and LLM again refused her request. (*Id.* ¶ 46.)

Attached to Bentley's January 4, 2021 letter was an unsigned, undated document entitled "Lutheran Life Ministries Change in Control Severance Plan" (the Plan) that Bentley cited as grounds for denying Smith's claim for severance. (*Id.* ¶ 43.) Smith had never previously seen or

4

discussed this document with anyone at LLM, and it was not attached to her offer letter. (*Id.*) Smith then asked Bentley for a "signed and date-verified version and indication of Board approval from official minutes." (*Id.*) Bentley never responded to this request. (*Id.* ¶ 44.) Smith only saw a signed version of the Plan on February 9, 2021, after receiving a copy of her personnel file pursuant to the Illinois Personnel Records Review Act. (*Id.* ¶ 48.) This copy of the Plan contained a different document number from the unsigned copy Smith received on January 4, 2021, was signed by the Chairman of Board, and had a printed effective date of December 3, 2018. (*Id.* ¶¶ 49–52.) Nevertheless, the Board's meeting minutes for December 3, 2018, contain no mention of the Board adopting or authorizing the Plan. (*Id.* ¶ 53.) Smith also attended every Board meeting that occurred between the start of her employment with LLM on February 4, 2019, and her departure from the company on February 5, 2021, and the Plan was never adopted, authorized, or discussed at any of those meetings. (*Id.* ¶ 54.) Additionally, LLM never provided Smith with a summary plan description as required by 29 U.S.C. § 1022. (*Id.* ¶¶ 58–59.)

The Plan provides a definition of "Transition Period," which was not included in the Severance Agreement. According to the Plan, "Transition Period shall mean the period of time which commences upon the execution of a definitive agreement which results in a Change in Control and ending on the first anniversary date of a Change in Control." (*Id.* Ex. G at 2.) In turn, the Plan defines "Change in Control" as:

> [T]he occurrence of one or more of the following events: (a) one or more persons or entities acquire the ability to appoint fifty percent (50%) or more of the Board of Directors of LLM; (b) LLM is part of a merger, conversion, consolidation or otherwise undergoes a corporate transformation where the Board of Directors immediately prior to such transaction does not represent at least fifty percent (50%) of the Board of Directors immediately following such transaction; (c) more than fifty percent (50%), by value, of the assets of LLM are sold; (d) LLM enters into a joint operating agreement with another person or entity; and/or (e) LLM contracts

with another person or entity to perform a material portion of the management functions of LLM.

(*Id.* Ex. G at 1-2.)

Finally, both the Severance Agreement and the Plan specify that they are to be construed as welfare benefit plans under ERISA. (*See id.* Ex. A, ¶ 2 ("This [Severance] Agreement … shall be construed and enforced under [ERISA], as an unfunded welfare benefit plan."); *id.* Ex. G at 1 ("It is the intent of LLM that the Plan, as set forth herein, constitutes an 'employee welfare benefit plan' within the meaning of Section 3(1) of [ERISA] and complies with the applicable requirements of ERISA.").)

Based on these facts, Smith makes three claims for relief in her Second Amended Complaint. First, Smith seeks to use ERISA to enforce her rights to severance payments under the Severance Agreement pursuant to 29 U.S.C. § 1132(a)(1). Second, Smith seeks to recover the severance payments under an ERISA promissory estoppel theory pursuant to 29 U.S.C. § 1132(a)(3). Finally, Smith brings a state law promissory estoppel claim regarding LLM's promise to provide Smith company housing so that she would not need to relocate from her permanent residence in Missouri. LLM now seeks to dismiss Smith's two ERISA claims, while Smith asks the court to strike an allegedly new argument from LLM's reply brief.

## **LEGAL STANDARD**

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. On a motion under Rule 12(b)(6), the complaint's factual allegations, not legal conclusions, are

6

taken as true and all reasonable inferences are drawn in the plaintiff's favor. *See Iqbal*, 556 U.S. at 678–79; *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 734 (2011). That said, the Seventh Circuit recognizes that a plaintiff may plead herself out of court "when it would be necessary to contradict the complaint in order to prevail on the merits." *Tamayo* v. *Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008). Furthermore, "[i]f the plaintiff voluntarily provides unnecessary facts in her complaint, the defendant may use those facts to demonstrate that she is not entitled to relief." *Id.*

Documents that are attached to a complaint are considered part of that pleading. Fed. R. Civ. P. 10(c). Furthermore, "[i]t is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *N. Ind. Gun & Outdoor Shows, Inc.* v. *City of South Bend*, 163 F.3d 449, 454 (7th Cir. 1998). The court, however, must also consider why the plaintiff has attached the document to the complaint, *see Williamson* v. *Curran*, 714 F.3d 432, 436 (7th Cir. 2013), and should hesitate to conclude that the contents of a document represent the truth when they are attached "for reasons unrelated to their truthfulness," *N. Ind. Gun*, 163 F.3d at 455. *Accord Otis* v. *Demarasse*, 886 F.3d 639, 646-47 (7th Cir. 2018). Likewise, a document attached to a motion to dismiss can be considered part of the pleading if that document was referenced in the complaint and is central to a claim, provided that the document requires no discovery to authenticate or disambiguate. *See Tierney* v. *Vahle*, 304 F.3d 734, 738 (7th Cir. 2002). And if a document explicitly references terms in another document, that second document also is incorporated. *See 188 LLC* v. *Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002). Consistent with these rules, the court may consider attached and incorporated documents in resolving a Rule 12(b)(6) motion without converting it into a motion for summary judgment. *See Tierney*, 304 F.3d at 738.

## ANALYSIS

A.    **Smith's Motion to Strike**

Because resolution of Smith's motion to strike could affect how the court considers the arguments made by LLM in its motion-to-dismiss reply brief, the court begins its analysis with Smith's motion. Smith asks the court to strike as an improper new argument LLM's discussion of the term "change in control" in its reply brief, then seeks to clarify LLM's allegedly "misleading statements" about the facts. (Dkt. 54.) But Smith's suggestion that LLM raised a new argument in its reply lacks merit—LLM's arguments about the "change in control" term clearly present a further development of like arguments made in its opening brief. (*Compare* Dkt. 39 at 13–14 *with* Dkt. 52 at 3–5.) Similarly, Smith's discussion of LLM's alleged mischaracterization of facts simply presents another front in the dispute over the provenance of the Plan that permeates the briefs. In short, LLM makes no new arguments that the court must strike as improper. Smith's motion to strike is denied.

B.    **LLM's Motion to Dismiss Smith's ERISA Enforcement Claim**

Moving on to LLM's motion, it argues that the court should dismiss Smith's ERISA claim for enforcement of the Severance Agreement because she failed to exhaust her internal administrative remedies and to properly allege that she was actually eligible for severance benefits. Smith responds by arguing that the terms of the Severance Agreement control, questioning whether the Plan existed prior to her notice of constructive termination, and contending that LLM could not use the Plan to modify the Severance Agreement after she submitted notice of constructive termination. Smith only briefly responds to LLM's failure to exhaust argument by indicating that she exhausted her administrative remedies under the Severance Agreement and could not be expected to follow the remedies under the Plan because it

8

was specifically created after the fact to deny her claim for benefits. The court need not reach the exhaustion issue, however, because it agrees with LLM that Smith's allegations do not demonstrate her eligibility for severance benefits under the Severance Agreement.

      The factual dispute about whether the Plan existed when Smith signed the Severance Agreement is not properly at issue at the motion to dismiss stage. Smith specifically alleges facts that could plausibly support the conclusion that the Plan, as provided to her on January 4 and February 9, 2021, did not exist when she agreed to the Severance Agreement in December 2018 and that LLM drafted the Plan after the fact to falsely appear to have been in force since 2018. (*See* Dkt. 34, ¶¶ 49–62.) The court is not required to treat the December 3, 2018 effective date listed in the Plan as dispositive because Smith attached the Plan to her complaint to demonstrate LLM's alleged skullduggery—not to adopt its terms as true. And as the court must treat a plaintiff's well-pleaded factual allegations as true in considering a motion to dismiss, it assumes the Plan did not exist when the parties entered into the Severance Agreement. Thus, in summary, all parties agree that Smith entered into the Severance Agreement and that the Severance Agreement discusses the Reference Plan. LLM contends that the Reference Plan and the Plan are one and the same, and that the Severance Agreement therefore incorporates the Plan by reference. But Smith plausibly alleges that the Plan did not exist when she and LLM executed the Severance Agreement on December 28, 2018, that the terms of the Reference Plan are fully set forth in the Severance Agreement, and that therefore the Severance Agreement alone controls. Drawing all reasonable inferences in Smith's favor, the court evaluates the sufficiency of her complaint under the assumption that the Severance Agreement—without reference to the Plan—governs her eligibility for benefits.

Even operating under this assumption, however, Smith still has not pleaded facts sufficient to establish entitlement to benefits under the Severance Agreement. A beneficiary may bring a civil action under ERISA "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1). "This provision is designed to protect contractually defined benefits and follows traditional forms of contract relief." *Dean* v. *Nat'l Prod. Workers Union Severance Trust Plan*, 46 F.4th 535, 543 (7th Cir. 2022) (internal quotation marks omitted). Accordingly, federal common law rules of contract interpretation govern the interpretation of ERISA plans. *Id.* Under federal common law, courts may determine the meaning of unambiguous contract terms as a matter of law, *see Schultz* v. *Aviall, Inc. Long Term Disability Plan*, 790 F. Supp. 2d 697, 701 (N.D. Ill. 2011), interpreting such language "in an ordinary and popular sense as would a person of average intelligence and experience," *Dean*, 46 F.4th at 543. Where a term is capable of more than one reasonable meaning, however, the term is ambiguous and becomes a question for the trier of fact. *See Teamsters Loc. Union No. 727 Health and Welfare Fund* v. *L&R Grp. of Cos.*, No. 11 CV 1747, 2016 WL 520998, at *15 (N.D. Ill. Feb. 10, 2016), *aff'd as amended by* 844 F.3d 649 (7th Cir. 2016); *Bock* v. *Computer Assoc. Int'l, Inc.*, 257 F.3d 700, 706 (7th Cir. 2001). When interpreting an ambiguous term, the trier of fact must "determine what the contracting parties intended the clause to mean" and may consider extrinsic evidence of the parties' intent. *L&R Grp.*, 2016 WL 520998, at *15.

Here, the Severance Agreement provides for Smith to receive severance benefits if her "employment is terminated during a Transition Period (a) by the LLM System other than for Cause, death, or disability, or (b) through Constructive Termination." (Dkt. 34, ¶ 3(c).) Reading this language "in an ordinary and popular sense," *Dean*, 46 F.4th at 543, Smith must allege facts

10

sufficient to satisfy three elements: (1) termination of employment (2) during a Transition Period (3) either without cause or through constructive termination. Without access to the definition of Transition Period provided by the Plan, such term is capable of many reasonable meanings and is therefore ambiguous. *See Bock*, 257 F.3d at 706. Consequently, the court considers whether any factual allegations, taken as true, would allow the court to infer what the parties intended by including the "Transition Period" term in the Severance Agreement. The December 27, 2018 offer letter—as incorporated into the complaint by Smith's citation to and reliance on its terms in support of her claims, *see* Fed. R. Civ. P. 10(c); *Williamson*, 714 F.3d at 436; (Dkt. 34, ¶ 15)—provides such an allegation. The offer letter explains that the Severance Agreement "provides for 18 months' severance in the event of a change of control as outlined in the agreement." (Dkt. 34, Ex. B at 2.) Such explanation corresponds with the full title of the Severance Agreement: "Agreement Under Lutheran Life Ministries *Change in Control* Severance Plan." (*Id.* Ex. A. (emphasis added).) Absent any factual allegations suggesting otherwise, the court reasonably infers that the parties intended for "Transition Period" to relate to a change of control.

Although the offer letter provides no definition of "change of control," such term is only capable of supporting one reasonable definition: a change in who has legal authority to manage and govern LLM. *See Control, n.*, Oxford English Dictionary[2] ("2.a. The fact or power of directing and regulating the actions of people or things; direction, management; command."); *Control*, Black's Law Dictionary (11th ed. 2019) ("The direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities,

---

[2] Available at https://www.oed.com/view/Entry/40562 (last updated Dec. 2022).

by contract, or otherwise; the power or authority to manage, direct, or oversee.").[3] As such, the court can determine the meaning of this term as a matter of law. *See Teamsters*, 2016 WL 520998, at *15. As LLM is an Illinois not-for-profit corporation (dkt. 34, ¶ 3), Illinois law makes clear that "except as provided in [the] articles of incorporation, the affairs of the [not-for-profit] corporation shall be managed by or under the direction of the board of directors," 805 Ill. Comp. Stat. 105/108.05(a). Because control of an Illinois nonprofit therefore ultimately resides in its board, "change of control" must refer to a change in the board of directors, such as by acquisition, sale, or merger. Again, absent any factual allegations suggesting otherwise, the court reasonably infers that the parties intended for "Transition Period" to relate to such a change in the Board's authority to manage and govern LLM.

To succeed on her ERISA enforcement claim, therefore, Smith must allege both that she was terminated (either without cause or constructively) and that this termination related to LLM's undergoing a change of control. Here, Smith has clearly alleged sufficient facts to plausibly demonstrate constructive termination. (*See* Dkt. 34, ¶¶ 29, 35–39.) But she makes no allegations regarding any changes involving the Board and makes no suggestions that some other person or entity acquired the legal ability to govern LLM's affairs. To be sure, Smith highlights the hiring of Bentley as President and CEO following Jantzen's departure from LLM. (*Id.* ¶¶ 27–28.) But personnel turnover in an executive officer position has no impact on the Board's authority over LLM, and the act of hiring Bentley itself reflects an exercise in management authority by the Board. *See* 805 Ill. Comp. Stat. 105/108.50(a) ("Officers and assistant officers

---

[3] A review of common usage shows that "change of control" is typically used synonymously with "change in ownership." *See Cocquyt* v. *SpartanNash Co.*, No. 21-3254, 2022 WL 3273804, at *1 (7th Cir. Aug. 11, 2022); *Bunn* v. *Fed. Deposit Ins. Corp.*, 908 F.3d 290, 292 (7th Cir. 2018); *In re Biglari Holdings, Inc.*, 813 F.3d 648, 652 (7th Cir. 2016); *VDF FutureCeuticals, Inc.* v. *Stiefel Labs., Inc.*, 792 F.3d 842, 844, 846 (7th Cir. 2015); *H-D Mich., LLC* v. *Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 835-36 (7th Cir. 2012); *Comrie* v. *IPSCO, Inc.*, 636 F.3d 839, 840 (7th Cir. 2011).

and agents [of a not-for-profit corporation] as may be deemed necessary may be elected or appointed by the board of directors or chosen in such other manner as may be prescribed by the bylaws."). In short, the complaint as written alleges that LLM acquired a new supervisor to oversee its operations but experienced no change of control. Absent any allegations that LLM experienced a change of control, Smith cannot satisfy the "during a Transition Period" element of her claim for severance benefits. Accordingly, the court grants LLM's motion to dismiss Smith's ERISA enforcement count for failure to state a claim on which relief can be granted.

C.     **LLM's Motion to Dismiss Smith's ERISA Promissory Estoppel Claim**

Next, LLM argues that the court should dismiss Smith's ERISA promissory estoppel claim because Smith has failed to identify any written misrepresentations she relied on. Smith responds by reiterating the two legal theories advanced in her complaint. First, Smith argues that LLM "should be estopped from denying [Smith] her severance benefits premised on a 'Plan' that did not exist prior to Smith's notice of constructive termination and was never provided to [her] during her employment with LLM." (Dkt. 48 at 12.) Second, Smith contends that she reasonably relied on the representations in the offer letter and Severance Agreement when deciding to accept employment with LLM to her detriment. Neither of these theories satisfies all elements of an ERISA estoppel claim.

Under ERISA, a plan participant or beneficiary may seek equitable relief—which includes estoppel claims—under 29 U.S.C. § 1132(a)(3). *See CIGNA Corp.* v. *Amara*, 563 U.S. 421, 438-45 (2011). To state an ERISA claim for promissory estoppel, a plaintiff must show: "(1) a knowing misrepresentation; (2) made in writing; (3) with reasonable reliance on that misrepresentation by the plaintiff; (4) to [her] detriment." *Schatzel* v. *Cent. States Se. and Sw. Areas Pension Fund*, 941 F. Supp. 2d 999, 1010 (N.D. Ill. 2013) (quoting *Coker* v. *Trans World*

13

*Airlines, Inc.*, 165 F.3d 579, 585 (7th Cir. 1999)). Smith's first argument regarding the purpose and timing of the Plan's creation plainly fails to meet these elements. Although Smith pleads facts sufficient to plausibly allege that the Plan is a knowing misrepresentation made in writing, she denies that the Plan existed in December 2018 when she accepted LLM's offer of employment and makes no allegations that she relied on the Plan after learning of its existence in 2021. (Dkt. 34, ¶¶ 82–84, 101–23.) To the contrary, Smith's allegations show her challenging LLM's use of the Plan to deny her severance benefits and never acquiescing to that decision. (*See id.* ¶¶ 99–105.) Without reasonable reliance on the Plan, Smith's allegations of LLM's misconduct in creating the Plan cannot give rise to an ERISA promissory estoppel claim.

Smith's second theory regarding her reliance on the offer letter and Severance Agreement fares no better. Although Smith shows that she reasonably relied on the offer letter and Severance Agreement in deciding to accept employment with LLM (*see id.* ¶¶ 68–84), she does not adequately allege that either the offer letter or Severance Agreement contained a knowing misrepresentation. Smith never alleges that LLM knew it would not honor the Severance Agreement or otherwise negotiated in bad faith during the parties' 2018 discussions. Additionally, because Smith's promissory estoppel count includes extensive allegations describing how the Plan did not exist when she agreed to work for LLM, she has pleaded herself out of any argument that LLM knowingly hid the terms of the Plan from her when she signed the Severance Agreement. *See Tamayo*, 526 F.3d at 1086; (Dkt. 34, ¶¶ 83, 109–13, 115–21).

Furthermore, the terms of the offer letter and Severance Agreement contradict Smith's allegation "that the sale of LLM was [not] a condition necessary for her to be paid her severance." (Dkt. 34, ¶ 114.) The offer letter clearly states that the Severance Agreement provides for severance benefits only "in the event of a change of control." (Dkt. 34 Ex. B at 2).

14

And as discussed above, the "Transition Period" term in the Severance Agreement likewise conditions eligibility for severance benefits on a change of control. As a result, Smith cannot claim that LLM misrepresented what conditions would trigger the payment of severance benefits in the offer letter and Severance Agreement. *See N. Ind. Gun*, 163 F.3d at 454 ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."). Without a knowing misrepresentation, Smith's reliance on the offer letter and Severance Agreement cannot give rise to an ERISA promissory estoppel claim. Accordingly, the court grants LLM's motion to dismiss Smith's ERISA promissory estoppel count for failure to state a claim on which relief can be granted.

D.     **Smith's Remaining State Law Claim**

Smith's third claim for relief is a state law promissory estoppel claim related to LLM's promise to provide executive housing and is brought under this court's supplemental jurisdiction. (*See* Dkt. 34, ¶¶ 6, 125–41.) As the court dismisses Smith's federal question claims over which it has original jurisdiction, the court declines to exercise supplemental jurisdiction over this remaining state law claim. *See* 28 U.S.C. § 1367(c)(3); *Dietchweiler by Dietchweiler* v. *Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) ("[W]hen the federal claims are dismissed before trial, there is a presumption that the court will relinquish jurisdiction over any remaining state law claims."). However, the court notes that Smith initially brought this claim under the court's diversity jurisdiction in her original complaint and that the court specifically found that the claim survived LLM's earlier motion to dismiss. (*See* Dkt. 1, ¶¶ 2–4; Dkt. 15.) Although Smith's Second Amended Complaint no longer alleges diversity jurisdiction, it appears that the statutory requirements for diversity continue to be met: Smith appears to be a Missouri citizen, LLM is an Illinois corporation, and Smith seeks more than $75,000 in damages. *See* 28 U.S.C. § 1332(a);

15

(Dkt. 34, ¶¶ 2–3, 141). As such, Smith is given 14 days to amend her complaint to properly allege diversity jurisdiction. As the court has already concluded that Smith's state law promissory estoppel count states a cognizable claim (*see* dkt. 15), the court expects no further motions to dismiss unless LLM wishes to contest subject matter jurisdiction following the complaint's amendment.

## **CONCLUSION AND ORDER**

For the foregoing reasons, Smith's motion to strike is denied and LLM's motion to dismiss for failure to state a claim is granted. The court dismisses Smith's ERISA claims with prejudice.[4] As the court dismisses all claims against the Board, the Board is dismissed as a defendant. Smith is given leave to refile an amended complaint within 14 days that properly alleges diversity jurisdiction for her remaining state law promissory estoppel claim against LLM, if she wishes to proceed on that claim in federal court.

Date: February 28, 2023

_____
U.S. District Judge Joan H. Lefkow

---

[4] Dismissal with prejudice is proper where, as here, the plaintiff has already had the opportunity to amend the complaint following an earlier motion to dismiss. *See Runnion ex rel. Runnion* v. *Girl Scouts of Greater Chi. And Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed.").